UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| DIANNE M. KROGER, | ) | CIV. 11-4012-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER REVERSING AND |
| | ) | REMANDING THE DECISION OF |
| MICHAEL J. ASTRUE, | ) | COMMISSIONER |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Dianne M. Kroger, moves for reversal of the Commissioner of

Social Security's (Commissioner) decision denying her application for

supplemental security income (SSI) under Title XVI of the Social Security Act for

the time period between July 26, 2007, and September 17, 2009. The

Commissioner opposes this motion. The court reverses and remands.

**PROCEDURAL HISTORY**

On July 26, 2007, Kroger applied for SSI and alleged an onset date of

February 28, 2007. AR 111.[1] On October 15, 2007, the Social Security

Administration denied Kroger's application. AR 68. On January 15, 2008, Kroger

requested reconsideration, which was denied on April 17, 2008. AR 73. Kroger

then requested a hearing before an Administrative Law Judge (ALJ). AR 76. The

ALJ held a hearing on September 24, 2009, after which he determined that

Kroger was not disabled, and, thus, she was not entitled to SSI benefits. AR 3-

---

[1] All citations to "AR" refer to the appropriate page of the administrative
record.

13. On November 16, 2009, Kroger requested that the Appeals Council review the decision. AR 2.

On May 2, 2010, Kroger's counsel submitted additional evidence and a "Compassionate Allowances Inquiry" to the Appeals Council addressing a new medical condition, namely lung cancer (adenocarcinoma). AR 210-12. On July 16, 2010, the Appeals Council granted review and proposed finding Kroger disabled beginning on September 18, 2009, due to her lung cancer. AR 105-108.[2]

After Kroger submitted additional documents, the Appeals Council adopted the ALJ's decision for the time period of July 26, 2007, through September 17, 2009, but found that Kroger was disabled as of September 18, 2009. AR 660. Kroger appeals the Commissioner's final decision regarding the time period of July 26, 2007, through September 17, 2009. Docket 1 at ¶ 2.

**FACTS**

Kroger was 48 years old at the time of her application and turned 50 years old on May 20, 2009. AR 111. After Kroger suffered a head injury while waterskiing when she was 16, she began having seizures. AR 334. Kroger continues to take Dilantin for her seizures, but she has not had a seizure for over 20 years. AR 32.

---

[2] Along with this communication, the Appeals Council stated that it was enclosing a copy of a consultative review dated July 11, 2010, by state physician Dr. Gerald I. Bell. AR 106. On July 26, 2010, Kroger's counsel informed the Appeals Council that he did not receive Dr. Bell's consultative review. AR 667-68. On August 16, 2010, the Appeals Council sent Dr. Bell's consultative review to Kroger and gave her 25 days to provide further evidence or argument. AR 109-11. Kroger submitted a letter dated September 8, 2010, in response to Dr. Bell's report. AR 664-65.

After graduating from high school, Kroger worked in a machinery shop in Flandreau, South Dakota. AR 368. The machinery shop fired her because she had a seizure on her way to work. AR 368. Kroger then worked for Alibi, a bar in Dell Rapids, for an unknown period of time. AR 368. After Alibi, she worked in a bakery and, after that, cleaned houses for a couple of years. AR 368. She lived with her parents until her late 20s or early 30s, and then moved in with her boyfriend, Ross Goetz, with whom she has lived for over 20 years. AR 368. Kroger has no children, but Goetz's 21-year-old son lives in the home. AR 368. Kroger has not worked outside the home since she began living with Goetz. AR 368. Kroger's medical history is set out by each medical condition.

## I.    Hodgkin's Lymphoma

Kroger was diagnosed with Hodgkin's lymphoma[3] when she was 36 years old. AR 146. While Kroger has suffered from an occasional flare-up from her Hodgkin's,[4] she did not allege that she was disabled due to her Hodgkin's.

On June 10, 2008, a lab report showed that Kroger had a 6-mm by 6-mm noncalcified nodule in the right upper lobe of her lung. AR 411. A biopsy of the nodule later proved to be cancerous, and Kroger had a lobectomy of the right

_____

[3] "Hodgkin's disease, also known as Hodgkin's lymphoma, is a cancer of the lymphatic system." WebMD, http://www.webmd.com/cancer/ hodgkins-disease-directory (last visited Jan. 24, 2012).

[4] For example, on June 12, 2007, Dr. Michael McHale, M.D., noted that Kroger was found to "have some 'precancerous' lesions in her vaginal areas, and she is on Aldara cream for that," as prescribed by Dr. Jane O. Gaetze, M.D. at the Avera Women's Speciality Clinic. AR 306, 341. A subsequent biopsy report was benign, AR 352-53, and a March 26, 2008, pap smear was clear. AR 385, 389.

lung on October 19, 2009. AR 529. Because Kroger was not diagnosed with lung cancer during the time period at issue here, the remainder of the facts about Kroger's lung cancer are omitted.

## II.    Feet

In January of 2005, Kroger sought treatment from Dr. Nicola Pike, D.P.M., for severe pain and discomfort in her right toe. AR 428. Dr. Pike assessed that Kroger suffered from a chronic ingrown toenail and infection of the right great toe. AR 429. Kroger underwent some physical therapy. AR 426. During a March 17, 2006, appointment with Dr. Pike, Kroger reported that she was able to perform all of her normal activities and wear her normal shoes. AR 425.

Kroger did not complain about toe pain again until April of 2008. Dr. Pike removed Kroger's great right toenail and the toenail's root on April 4, 2008. AR 405. Following this procedure, Kroger experienced "purulent discharge," and she was prescribed antibiotics and foot soaks. AR 405.

Kroger also saw Dr. Pike for pain in her left foot in April of 2008, which Dr. Pike diagnosed as metatarsalgia (pain in the forefoot) and left joint bursitis.[5] AR 492-93. Dr. Pike referred her to physical therapy, AR 492, which Kroger attended in July and August of 2008. AR 436, 438, 461. On September 19, 2008, Kroger told Dr. Pike that she did not often experience foot pain and that she could perform her normal activities. AR 454.

---

[5] Bursitis is inflammation of the bursa, which is "[a] closed sac or envelope lined with synovial membrane and containing synovial fluid, usually found or formed in areas subject to friction (e.g., over an exposed or prominent body part or where a tendon passes over a bone)." *Stedman's Medical Dictionary* 280, 282 (28th ed. 2006).

During the hearing, Kroger testified that she was "still having problems with" her right toe and thought that she would have to see the doctor again because she did not think it was healing correctly. AR 52.

## III.    Mental Functioning and Rehabilitation Services

### A.   Mental Functioning

On December 14, 2007, Kroger applied for vocational rehabilitation (VR) services through the South Dakota Department of Human Services, Division of Rehabilitation Services (Rehabilitation Services). AR 200. Kroger's VR counselor, Vicki Nelson, told Kroger that she needed to have achievement testing completed before Rehabilitation Services would be able to assist her. AR 193. Dr. Elwin Unruh, a psychologist, performed the testing on January 28, 2008. AR 88, 371.

Dr. Unruh determined that Kroger had a verbal IQ score of 72, a performance IQ score of 74, and a full scale IQ score of 70. AR 371. Dr. Unruh also determined Kroger's grade equivalent scores for different categories, which represents Kroger's grade level functioning compared to the national norm group. AR 372. Kroger's ability to read was a grade equivalent of 8.8, her spelling ability was a grade equivalent of 7.3, and her math calculation, or "pencil and paper" math, was a grade equivalent of 4.4. AR 372. Dr. Unruh observed that Kroger experienced difficulties with affect or motivation because she easily became frustrated, agitated, or impulsive during the testing session. AR 377.

Dr. Unruh diagnosed Kroger as having premorbid intellectual functioning in the low-average levels, generalized anxiety disorder, attention deficit/hyperactivity disorder, and borderline intellectual functioning. AR 370. He

5

observed that Kroger "presents as an individual who is quite shy and dependent. She did not give the impression of having a great deal of insight as to choices she might make to improve her current status[.]" AR 369.

On April 15, 2008, Dr. Richard Gunn, Ph.D., a state agency psychologist, reviewed Kroger's examination and noted that while Kroger suffers from a generalized persistent anxiety disorder, her impairment was not severe. AR 390. He opined that Kroger's functional limits had a mild degree of limitation on her activities of daily living and in maintaining concentration, persistence, or pace, no limitation in maintaining social functioning, and no episodes of decompensation. AR 400. Dr. Gunn summarized that Kroger's intellectual level is in the borderline intellectual functioning range, but her functioning is such that she can care for herself and others and "could do basic routine work." AR 402.

During the hearing, Kroger testified that she "sometimes get[s] kind of scared," nervous, and "[k]ind of shaky" around people and that issue has persisted for a while. AR 35, 46. She reads the newspaper, but if she wants to remember something, she has to write it down. AR 46. Goetz testified that Kroger sometimes needs to reread directions or a recipe several times before she can understand it. AR 57-58.

**B. Rehabilitation Services' Findings**

Rehabilitation Services found that Kroger was eligible for services under "Priority Category II– Significantly Disabled" with primary disabilities of "Manipulations/Dexterity Orthopedic/Neurological Impairments," due to a "multi-level degenerative disk disease with disk herniations throughout the spine

6

to the lumbar spine" and "bilateral carpal tunnel syndrome." AR 197. Rehabilitation Services concluded that Kroger "[i]s restricted to sedentary or light duty activities and occupations classified by the DOL [Department of Labor]. She needs to avoid frequent repetitive use of her arms and avoid heavy lifting." AR 197.

On January 16, 2008, Nelson reviewed Kroger's medical records and noted that her limitations include avoiding heavy lifting and frequent use of her arms. AR 189. On February 25, 2008, Nelson and Kroger met to discuss Kroger's VR plans. AR 187. Kroger stated that her back pain prevented her from participating in the various situational assessments offered by Nelson. AR 187. Nelson stated that she would keep Kroger's file open for a period of time to determine whether Kroger could participate in assessments or if she would receive SSI benefits. AR 187.

On April 7, 2008, Kroger told Nelson that she had her toe nail and root removed, and the doctor estimated that she would need six weeks to recover. AR 186. On May 30, 2008, Kroger informed Nelson that her toe was infected, and she would be unable to do anything until it was healed. AR 184. On June 16, 2008, Kroger again informed Nelson that she was unable to try to work due to continuing issues with her toe. AR 183. On June 26, 2008, Kroger informed Nelson that her toe was still sore and her doctor had found a lump in her body that needed to be checked out. AR 182.

On August 22, 2008, Nelson notified Kroger that she was in the process of closing Kroger's file because of her continued medical issues. AR 180. Kroger did

not contest the closing of her VR file, and the file was closed on September 5, 2008. AR 178.

## IV.    Arthritis/Carpal Tunnel Syndrome

Kroger repeatedly has been diagnosed as having arthritis.[6] AR 306, 409, 472, 538. Kroger also suffers from carpal tunnel syndrome.[7] During a January 24, 2007, appointment with Dr. Wilson Asfora at Sanford Clinic Neurosurgery and Spine, Dr. Asfora noted that Kroger suffered from numbness and tingling in both hands. AR 262. He suspected that Kroger had bilateral carpal tunnel syndrome and scheduled her for further testing. AR 264.

Physical therapist John Decker, MPT, at the Dell Rapids Community Hospital completed Kroger's nerve conduction studies on February 23, 2007, which revealed that both ulnar nerves at the elbow fell slightly out of accepted parameters. AR 294-95. Decker also found that Kroger's right median nerve fell out of accepted parameters. AR 297. Rehabilitation Services found that one of Kroger's primary disabilities was orthopedic dexterity and manipulation and stated that she had bilateral carpal tunnel syndrome. AR 197.

---

[6] Some documents in the record refer to "osteoarthritis," AR 306, 409, 472, 538, but Kroger testified she has "arthritis." AR 42. All the records, however, reference osteoarthritis or arthritis in Kroger's hands. The court will use arthritis for simplicity and because it is inconsequential whether Kroger's condition is "osteoarthritis" or "arthritis."

[7] "Carpal tunnel syndrome causes pain, tingling, and numbness in your hand from pressure on the median nerve in your wrist." WebMD, http://www.webmd.com/pain-management/carpal-tunnel/default.htm (last visited Jan. 11, 2012).

8

In her August 8, 2007, "Function Report," Kroger circled "using hands" as an area affected by her condition, and she noted that she cannot pick things up or hold them for a long time. AR 144. In her disability appeal report, Kroger stated that it hurt to bend her fingers, her hands were shaky, she struggled to button shirts, hook bras, and she sometimes experienced trouble cutting her finger and toe nails. AR 160, 164. In her next disability report, Kroger noted that her hands were more shaky, she struggled to open jars and tie her shoes, and her arthritis caused her pain. AR 171, 174. Goetz noted that in addition to the activities listed above, Kroger also needs help tying her shoes. AR 174.

During the hearing, Kroger testified that sometimes it is difficult for her to open a jar. AR 9. She also testified that sometimes doing buttons and zippers is easy for her and sometimes not, and that the difficulty has existed since at least 2007. AR 41. She thought the difficulty could be due to arthritis, but she did not know. AR 42.

**V.    Back Issues**

On October 20, 2006, Kroger saw a doctor about right side low back pain that had been bothering her for a couple of days. AR 258. Kroger reported that she was on her knees cleaning the inside of a cupboard when she felt a popping sensation in her back and experienced pain. AR 300. Kroger underwent chiropractic treatments for her back from October 20, 2006, through November 3, 2006. AR 257-61.

On October 31, 2006, Kroger saw Dr. Matt Herber, M.D., at Dell Rapids Medical for her low back pain. AR 268. On November 11, 2006, Dr. Herber

prescribed Darvocet-N 100[8] to Kroger for her back pain. AR 267. Dr. Herber referred Kroger to physical therapist Decker, who saw Kroger for the first time on November 14, 2006. AR 300. Decker treated Kroger with muscle stretching, low back exercises, and ultrasound to reduce the pain. AR 300. When Decker saw Kroger the next day, Kroger was unable to tolerate any therapy except ultrasound therapy for ten minutes. AR 300.

On November 17, 2006, Kroger had an MRI taken pursuant to Dr. Herber's orders. AR 265. The MRI showed "a small central disc protrusion" at L5-S1, "which does not appear to have mass-effect on the thecal sac of S1 nerve roots." AR 265. Kroger had "T2 hyperintensity in the dorsal annulus consistent with degenerative annual tear," and a "broad-based right foraminal to lateral disc protrusion" at L4-L5, which contacted the extraforminal right L4 nerve root. AR 265. The MRI at L3-4 was unremarkable. AR 265. At L2-3, the MRI showed a "broad-based small central disc protrusion which mildly indents the ventral thecal sac." AR 265. The impression was that Kroger suffered from "multilevel degenerative disc disease and disc herniations[.]" AR 165.

Kroger received an epdiural steroid injection from Dr. Herber on November 21, 2006, AR 267, but it did not relieve her pain. AR 501. On December 15, 2006, Dr. Herber referred Kroger to surgeon Dr. Wilson Asfora, M.D. AR 267.

---

[8] Darvocet-N 100 is a prescription drug composed of propoxyphene, a narcotic pain reliever, and acetaminophen, a less potent pain reliever that increases the effects of propoxyphene. Drugs.com, http://www.drugs.com/mtm/darvocet-n-100.html (last visited Jan. 25, 2012).

During a January 24, 2007, appointment, Dr. Asfora noted that Kroger's back pain fluctuates, but she always experiences some level of persistent pain in her lower back and lower extremities. AR 262. Kroger also reported issues with "some incontinence." AR 262. Dr. Asfora noted that Kroger's gait was normal, but she had "tenderness to pressure in the midline in the midlumbar region." AR 263. Dr. Asfora opined that Kroger would not be a surgical candidate because of multilevel disc involvement and a history of smoking. AR 281.

On March 29, 2007, Dr. Lori Krome, who appears to be Kroger's family physician, referred Kroger to Dr. Jonathan Stone, M.D., at Avera Rehabilitation Associates. AR 281. Dr. Stone noted that Kroger's chiropractic treatments and epidural injections did not help with the pain. AR 281. Dr. Stone opined that Kroger's back pain was "mostly discogenic and probably from the annular tear that was noted on [the] MRI." AR 283. He prescribed physical therapy exercises to strengthen her core muscles. AR 283.

Physical therapist Decker saw Kroger on April 2, 2007. AR 290. Kroger did some stretches and one set of weight lifting exercises. AR 290. Decker ordered a plan of care for two to three days a week for four weeks. AR 290. Kroger attempted to do weight lifting exercises and walk on a treadmill, but she did not tolerate active physical therapy well and, thus, mostly received ultrasound, massage, and moist heat therapies. AR 290-91.

Dr. Stone saw Kroger on April 23, 2007, to assess her treatment plan. AR 279. He noted that she had moderate to severe limitations in her lumbar range of motion, and that extensions and rotations increased her pain. AR 279. He noted

11

that Kroger was "not tolerating much of the active therapy and only some passive modalities" in her physical therapy program. AR 280. He prescribed a Medrol Dosepak,[9] and replaced Propoxyphene[10] with Tramadol[11] to help control Kroger's pain. AR 280.

On April 30, 2007, Dr. Stone noted that Kroger "is not tolerating physical therapy at all," and "any time they try to do anything active, she flares up." AR 278. Dr. Stone recommended that Kroger try a TENS unit[12] for the pain, but Kroger was unsure whether she wanted to try that therapy. AR 278. He also prescribed Talwin[13] and directed her to use it as-needed. AR 278.

On November 30, 2007, Dr. Joseph Prasek, M.D., at the Avera Dell Rapids Medical Clinic examined Kroger for her back pain. AR 362. Dr. Prasek noted that

---

[9]  A Medrol Dosepak is "a steroid that prevents the release of substances in the body that cause inflammation." Drugs.com, http://www.drugs.com/mtm/medrol-dosepak.html (last visited Jan. 11, 2012).

[10] Propoxyphene is a narcotic pain reliever used to treat mild to moderate pain. Drugs.com, http://www.drugs.com/propoxyphene.html (last visited Jan. 11, 2012).

[11] Tramadol is a narcotic pain reliever used to treat moderate to severe pain. Drugs.com, http://www.drugs.com/tramadol.html (last visited Jan. 11, 2012).

[12]  A "TENS, or transcutaneous electrical nerve stimulation, is a back pain treatment that uses low voltage electric current to relieve pain." WebMD, http://www.webmd.com/back-pain/guide/tens-for-back-pain (last visited Jan. 11, 2012).

[13] Talwin is a "potent analgesic" (30 mg of Talwin is usually as effective as 10 mg of morphine) and is used to treat moderate to severe pain and may also be used as preoperative or preanesthetic medication. Drugs.com, http://www.drugs.com/pro/talwin.html (last visited Jan. 11, 2012).

12

Kroger had a history of back pain, and that her back pain was redeveloping. AR 362. In addition to pain, Kroger was also experiencing a burning sensation. AR 362. Dr. Prasek prescribed Celebrex[14] for Kroger and recommended physical therapy and trying a TENS unit. AR 362. On December 12, 2007, Kroger reported that the Celebrex did not reduce her pain, and Dr. Prasek again recommended that she try a TENS unit. AR 362. On January 23, 2008, Dr. Prasek hooked Kroger up to the TENS unit and had her try that for a few weeks. AR 366. The TENS unit did not relieve her pain. AR 481.

Kroger continued to attend physical therapy in April and May of 2009. AR 481. She found some pain relief in the ultrasound therapy on some days but not on others. AR 481. Ron Tibke, RPT, found that Kroger "has been working on her exercises but she is really reporting no improvement." AR 481.

During a July 1, 2009, appointment with Dr. Prasek, Kroger reported that if she sits for too long, the pain radiates from her lower back to her superior buttock region, and that this condition had existed for about six months. AR 501. Kroger reported that she was very slow in getting out of bed in the mornings due to significant pain. AR 504. Dr. Prasek noted that Kroger takes over-the-counter pain medications to help alleviate the pain and physical therapy was unsuccessful. AR 501. Dr. Prasek concluded that the only remedy available to

---

[14] Celebrex is a nonsteroidal anti-inflammatory drug that treats pain and inflammation by reducing hormones that cause pain and inflammation. Drugs.com http://www.drugs.com/celebrex.html (last visited Jan. 11, 2012).

13

Kroger was epidural injections, but a past epidural injection was unsuccessful. AR 501.

On March 25, 2009, Dr. Prasek noted that an examination of Kroger's lower extremities was normal, she had diminished but symmetric Achilles Tendon reflexes, and symmetric but moderately to severely weak flexion of the lower extremities with leg extension. AR 507. He further noted that her lower leg flexion was slightly stronger, she had good toe raises and plantar flexion, but she had bilateral diminished hip flexures, the right sightly more than the left. AR 507-08. He ordered another MRI. AR 508. A March 26, 2009, MRI showed that the "[m]ultilevel degenerative spondylosis as described [had] not significantly changed since 2006[.]" AR 486.

During an April 13, 2009, appointment with Dr. Prasek, Kroger reported that she had slipped and further hurt her back "a number of weeks ago[.]" AR 504. Kroger reported that rolling from one side of the bed to the other sometimes woke her up because of the pain and it was difficult for her to bend over. AR 504. She stated that she was unable "to do any adequate work," because the pain was a constant "nag" for her. AR 504. Kroger had another MRI, which showed no significant progress from her March 2009 MRI. AR 505. The radiologist believed that Kroger continued to suffer from "multilevel degenerative spondylosis." AR 505.

On September 18, 2009, Dr. Prasek responded to a questionnaire provided by Kroger's counsel. AR 518-525. Dr. Prasek stated that he believed Kroger's back condition would not change and that medications, a TENS unit, and

14

epidural injections had not provided any significant relief. AR 518-19. He stated that Kroger's back condition would occasionally interfere with the attention and concentration she needed to perform even simple work tasks and that she could not tolerate physical stress to her back in a work environment. AR 521. He believed that Kroger could walk about 2 blocks without rest, sit 10-20 minutes at one time, stand 10-20 minutes at one time, and sit and stand/walk less than 2 hours total in an 8-hour workday. AR 521-22. He stated that Kroger would likely need a job that permitted her to shift from sitting, standing, or walking at will and would need frequent, unscheduled breaks lasting 10-15 minutes and, during these breaks, Kroger may need to lie down or sit quietly. Ar 521-22. He believed that she could occasionally or frequently lift and carry less than 10 pounds, occasionally lift and carry 10 pounds, and never lift and carry more than 20 pounds. AR 522. She could never twist or stoop and could rarely crouch or squat, climb ladders, or climb stairs. AR 523. Dr. Prasek estimated that Kroger would be absent more than four days a month due to her back condition. AR 524.

A September 5, 2007, physical residual functional capacity (RFC) assessment, which was conducted by state medical consultant Dr. M. Horsley, found that Kroger could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit with normal breaks about 6 hours in an 8-hour workday, and push and/or pull an unlimited amount of time. AR 355. Dr. Horsley further found that Kroger could occasionally stoop, crouch, and climb ramps, stairs, ladders, ropes, and

scaffolds, and frequently balance, kneel, and crawl. AR 356. Dr. Horsley found no manipulative limitations such as reaching in all directions, handling, fingering (fine manipulation), or feeling, no visual limitations, no communication limitations, and, for environmental limitations, only determined that Kroger should avoid concentrated exposure to vibration. AR 357.

During the hearing, Kroger testified that she continues to do exercises for her back and currently does not take any prescription medication because the drugs were ineffective and she experiences side effects like nausea and "dizzy spells." AR 30, 47. Kroger also testified about her limitations. While she has a driver's license, she usually does not drive. AR 39. She can ride in a car for about 30 minutes before her back starts hurting her and she needs to lie down in the backseat. AR 39.

Kroger testified that she can lift about 10 pounds. AR 39. She can walk a city block, and sometimes longer than a city block. AR 39. When she sits down, she needs to sit in a chair with arms so she can hold on to the arms and steady herself when she gets out of the chair. AR 51. If the chair does not have arms, she needs something else to help her get out of the chair. AR 51. She can sit for approximately 25 minutes. AR 39-40. If she sits too long, her back starts "throbbing," she experiences a burning sensation "like a fire," and her pain increases from five to a six or seven on a scale of zero to ten. AR 43, 49.

Kroger testified that she can stand no longer than 20 minutes. AR 39. She cannot stand long enough to finish washing all of the dishes at one time; instead she washes some dishes, sits down and takes a break, and then finishes the

16

remainder. AR 44. She needs help putting the dishes away. AR 139. Kroger can take the sheets off of the bed but she needs help to make the bed. AR 45. During the day, Kroger sometimes needs to lie down when her back or legs are sore. AR 46. She cannot go shopping alone because she has a hard time getting down to pick up a can or jar and then getting back up without assistance. AR 50.

Kroger completes the majority of her personal care tasks by herself, but she needs to use hand rails when she uses the bathtub. AR 138. She cannot touch her toes and was unsure whether she could touch her knees. AR 40. She is only able to squat if she has something beside her to hold on to. AR 40-41. She can only climb a flight of stairs, consisting of 10-12 stairs, if there is a handrail. AR 41. She testified that she can reach over her head to grab things, for example, to grab a plate out of a cupboard and bring it down to the counter. AR 41.

If Kroger has a bad day of pain, she needs to lie in bed or on the couch. AR 50. Kroger has bad days about twice a week. AR 50. Goetz has noticed Kroger's pain and testified that "[y]ou can actually see it in her face." AR 56. He also noted that Kroger needs to lie down "quite often throughout the week[.]" AR 57.

Kroger takes longer to complete her household chores than she used to when she did not have back pain. AR 51. For example, she used to be able to clean the whole bathroom without needing a break. AR 52. Now, she needs to take breaks to finish cleaning the bathroom. AR 52. Goetz similarity testified that Kroger's back has caused her difficulty in completing the chores. AR 54. Because Kroger stumbles down the stairs if she goes into the basement to do laundry, Goetz often does the laundry. AR 54. Sometimes Goetz has to help Kroger out of

17

bed due to the pain in her back and legs. AR 54. Goetz has to "chip in generously" with the chores since Kroger hurt her back. AR 54.

Before her back injury, Goetz and Kroger enjoyed doing outdoor activities together, such as going on a picnic or going fishing. AR 55. Kroger can no longer do some of those activities, especially if they require her to do "a little bit of hiking to get to a correct spot[.]" AR 55. Kroger used to do some yard work such as raking and cleaning up, but she no longer does yard work. AR 55. She can no longer garden. AR 56.

Tom Odette, a vocational expert, also testified during the hearing. The ALJ's first hypothetical to Odette assumed a woman age 40-50 with a high school education who can only perform light work, meaning she can lift 20 pounds occasionally, and 10 pounds frequently. AR 59. This individual can sit with normal breaks for a total of 6 hours in an 8-hour workday, stand, and walk with normal breaks, as long as uneven terrain is avoided. AR 59. The individual cannot climb ladders, ropes, or scaffolds, work at unprotected heights, work around mechanical parts, or operate a commercial motorized vehicle. AR 59. She can occasionally climb stairs and ramps, stoop, and crouch, frequently balance, kneel, and crawl, but must avoid concentrated exposure to vibration. AR 59. Odette testified that this individual could perform jobs such as a small products assembler, packager, and egg candler. AR 59, 60.

Keeping with this hypothetical, the ALJ then asked if these jobs would still be available if the individual were able to understand, remember, and carry out short, simple instructions. AR 61. Odette responded yes. AR 61.

18

The ALJ offered Odette a second hypothetical where a 48-year-old individual could lift and carry 10 pounds occasionally, less than 10 pounds frequently, stand and/or walk for 1-2 hours in an 8-hour workday, sit for a total of 6 hours in an 8-hour workday, occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl. AR 61. The individual could understand, remember, and carry out simple instructions, and interact appropriately with people at the workplace. AR 62. Odette responded that the individual would be able to work at jobs like a jewelry preparer, assembler, or stone setter. AR 62.

Kroger's attorney questioned Odette about the amount of time the individual in the second hypothetical would have to use her hands. Odette responded that there would be frequent reaching, frequent handling, and frequent fingering. AR 63. Kroger's attorney attempted to question Odette about an individual who is 50, cannot sit more than 20 minutes without a break, stand more than 20 minutes without a break, can occasionally lift 10 pounds, frequently lift less than 10 pounds, never twist or scoop, and rarely crouch, squat, climb ladders, or stairs. AR 63. The ALJ interrupted the attorney, asked if he was working off of Exhibit 27F, the attorney answered yes, and the ALJ stated that he would provide probative weight to that opinion. AR 64.

## ALJ DECISION

On September 24, 2009, the ALJ issued a decision denying Kroger's applications for SSI benefits. AR 3. The ALJ used the sequential five-step

evaluation process.[15] At the first step, the ALJ determined that Kroger never engaged in substantial gainful activity. At step two, the ALJ found that Kroger has the following severe impairments: "degenerative disc disease, lumbar spine, evidenced by multi-level spondylosis at L2-3, L4-5, and L5-S1 and disc bulging at L4-5 . . .; a history of Hodgkins lymphoma . . .; and a remote history of a seizure disorder[.]" AR 8. The ALJ determined that Kroger's carpal tunnel syndrome and osteoarthritis were not severe. At step three, the ALJ found that none of these impairments or a combination of impairments were of listing severity. At step four, the ALJ found that Kroger has the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk (with normal breaks) for 6 hours in an 8-hour workday, sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, frequently balance, kneel, and crawl, occasionally climb stairs and ramps, stoop, and crouch, and never climb ladders, ropes, or scaffolds, work at unprotected heights or with moving mechanical parts, or operate a commercial motor vehicle. The ALJ further found that Kroger has the mental capacity to understand, remember, and carry out short, simple instructions, interact appropriately in the work environment, and make judgments on simple work-related decisions. At step five, the ALJ

---

[15] An ALJ must follow " 'the familiar five-step process' " to determine whether an individual is disabled: "(1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work." *Martise v. Astrue*, 641 F.3d 909, 921 (8th Cir. 2011) (quoting *Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010)); *see also* 20 C.F.R. § 416.920 (detailing the five-step process).

determined that while Kroger did not have any past relevant work, she was able to perform some jobs. Thus, the ALJ found that Kroger was not disabled.

## STANDARD OF REVIEW

An ALJ's decision must be upheld if it is supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g). "Substantial evidence is 'less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' " *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Maresh v. Barnhart*, 438 F.3d 897, 898 (8th Cir. 2006); *see also Richardson v. Perales*, 402 U.S. 389, 401 (1971) (reasoning that substantial evidence means "more than a mere scintilla." (citations omitted)). In determining whether substantial evidence supports the ALJ's decision, the court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010) (internal citation omitted). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have determined the case differently. *Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002) (citing *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993)).

In determining whether the Commissioner's decision is supported by substantial evidence, the court reviews the entire administrative record, and considers six factors: (1) the ALJ's credibility determinations; (2) the claimant's vocational factors; (3) medical evidence from treating and consulting physicians; (4) the claimant's subjective complaints relating to activities and impairments;

(5) any third-party corroboration of claimant's impairments; and (6) a vocational expert's testimony based on proper hypothetical questions setting forth the claimant's impairment(s). *Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585-86 (8th Cir. 1992) (citing *Cruse v. Bowen*, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The court also reviews the Commissioner's decision to determine if an error of law has been committed, which may be a procedural error, the use of an erroneous legal standard, or an incorrect application of the law. *Collins v. Astrue*, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted). Issues of law are reviewed de novo with deference accorded to the Commission's construction of the Social Security Act. *Id.* (citing *Juszczyk v. Astrue*, 542 F.3d 626, 633 (8th Cir. 2008)).

## DISCUSSION

Kroger argues that the ALJ made four reversible errors: (1) the ALJ failed to include severe impairments at Step 2; (2) the ALJ erred in ruling that Kroger's mental impairment did not meet Listing 12.05C at Step 3; (3) the ALJ erred in ruling that Kroger can work at Step 5; and (4) the limitations in the hypothetical questions to the vocational expert were not supported by substantial evidence.

## I.    Severe Impairments

Kroger argues that the ALJ erred in determining that her borderline intellectual functioning and carpal tunnel syndrome/osteoarthritis were not, singly or in combination, severe impairments. At Step Two of the sequential evaluation process, Kroger must establish that she has a medically determinable physical or mental impairment that is severe. 20 C.F.R. § 416.920(a)(4)(ii); *Kirby*

*v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007) ("It is the claimant's burden to establish that [her] impairment or combination of impairments are severe." (citation omitted)). A severe impairment must "significantly" limit the claimant's physical or mental ability to do basic work activities, 20 C.F.R. § 416.920(c), such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, understanding, remembering simple instructions, using judgment, responding appropriately to usual work situations, and dealings with changes in a routine work setting. 20 C.F.R. §§ 416.921(b)(1)-(6). "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard[.]" *Kirby*, 500 F.3d at 708 (internal citation omitted).

An impairment is not severe if it amounts to only a slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities. *Id.*; 20 C.F.R. § 404.1521(a). Basic work activities concern the abilities and aptitudes necessary to perform most jobs, 20 C.F.R. § 404.1521(b), such as (1) walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervisors and co-workers; and (6) handling changes in a routine work setting. *Id.* The sequential evaluation process ends at Step Two if the impairment has no more than a minimal effect on the claimant's ability to work. *Kirby*, 500 F.3d at 707.

### A.  Mental Impairment

Kroger argues that the ALJ erred at Step Two by not listing her borderline intellectual functioning as a severe impairment. The Commissioner responds that the ALJ made a scrivener's error: "While it is true that the ALJ did not specifically mention borderline intellectual functioning as a severe impairment (Tr. 8), this appears to be a scrivener's error because at step three of the sequential evaluation process, the ALJ utilized the special technique used to determine the severity of mental disorders." Docket 20 at 6. The court infers from this statement that the Commissioner concedes that the ALJ intended to list "borderline intellectual functioning" as a severe impairment.

An ALJ's failure to include an impairment as a "severe impairment" at Step Two generally warrants a remand. *See, e.g.*, *Moraine v. Social Sec. Admin.*, 695 F. Supp. 2d 925, 956 (D. Minn. 2010) ("The Court of Appeals for the Eighth Circuit has held that an ALJ's erroneous failure, at Step Two, to include an impairment as a severe impairment, will warrant a reversal and remand, even where the ALJ found other impairments to be severe." (citations omitted)). While an ALJ errs at Step Two if he fails to list a severe impairment, the court often addresses the claimant's remaining arguments "in the interests of completeness . . . as they may assist in the consideration of her request for benefits." *Id.* at 956. On remand, the ALJ should clarify whether Kroger has a severe impairment of borderline intellectual functioning at Step Two.

24

**B.  Arthritis and Carpal Tunnel**

Kroger argues that the ALJ erred in failing to consider whether her arthritis is a severe impairment, in determining that her carpal tunnel syndrome is a non-severe impairment, and in failing to consider the limitations of her arthritis and carpal tunnel syndrome in determining her RFC.

The ALJ did not discuss Kroger's osteoarthritis. Kroger's medical records repeatedly state that she has been diagnosed as having osteoarthritis. AR 306, 409, 472, 538. During the hearing, Kroger testified that she has arthritis. AR 42.

In addition, Kroger's medical records show that she suffers from carpal tunnel syndrome. Before Kroger completed her nerve conduction studies, Dr. Asfora stated that he believed Kroger had bilateral carpal tunnel syndrome. AR 264. Kroger's February 23, 2007, nerve conduction studies revealed that both of her ulnar nerves at the elbow fell slightly out of accepted parameters and her right median nerve fell out of accepted parameters. AR 297. Rehabilitation Services also noted that Kroger suffered from bilateral carpal tunnel syndrome, and one of her primary disabilities was orthopedic dexterity and manipulation. AR 197.

In finding that Kroger's carpal tunnel syndrome was not severe, the ALJ relied on Kroger's testimony at the hearing that "she ha[s] some arthritis in her fingers" and has "no difficulties in using her hands other than being unable to get a lid off a jar as it was normally too tight." AR 9. The ALJ did not reference any other evidence in the record in making his determination.

25

During the hearing, Kroger testified that sometimes it was difficult for her to open a jar. AR 9. She also testified that sometimes doing buttons and zippers is easy for her and sometimes not, and that the difficulty has existed since at least 2007. AR 41. She thought the difficulty could be due to arthritis but she did not know. AR 42.

Kroger indicated in her documents to the Commissioner that her hands have caused her limitations. In her August 8, 2007, Function Report, Kroger circled "using hands" as an area affected by her condition and noted that she cannot pick things up or hold them for a long time. AR 144. In her disability appeal report, Kroger stated that it hurt to bend her fingers, her hands were shaky, and she struggled to button shirts, hook bras, and cut her finger and toe nails. AR 160, 164. In her next disability report, Kroger noted that her hands were more shaky, she struggled to open jars and tie her shoes, and her arthritis was causing her pain. AR 171, 174. Goetz noted that in addition to the activities listed above, Kroger also needed help tying her shoes. AR 174.

The ALJ erred in failing to discuss whether Kroger suffers from arthritis and, if so, whether this was a severe impairment. Further, substantial evidence does not support the ALJ's decision that Kroger's carpal tunnel syndrome, arthritis, or a combination of both is not a severe impairment. On remand, the ALJ should discuss whether Kroger suffers from arthritis and, if so, apply the five-step regulatory framework in assessing her impairment. In addition, at Step Two, the ALJ should find Kroger's carpal tunnel syndrome to be a severe

impairment and then further analyze the extent of the limitations caused by the carpal tunnel syndrome at Steps Three, Four, and Five.

The Commissioner concedes that the ALJ did not consider whether Kroger's arthritis was a severe impairment but argues that this error was harmless because the ALJ's analysis did not end at Step Two. An ALJ's error at Step Two does not necessarily require remand if the ALJ nonetheless considers the effects of any limitations arising from those impairments, severe or not, when determining the claimant's RFC.  *See, e.g.*, *Lorence v. Astrue*, 691 F. Supp. 2d 1008, 1029 (D. Minn. 2010) ("The ALJ's failure to include adrenal insufficiency as a severe impairment was not by itself reversible error, because the ALJ continued with the evaluation of Plaintiff's pain and fatigue in determining Plaintiff's residual functional capacity." (citation omitted)).

Here, however, in determining Kroger's RFC, the ALJ did not consider whether Kroger's arthritis or carpal tunnel syndrome limited the use of her hands. Moreover, in the hypothetical questions to the VE, the ALJ did not provide any limitations on Kroger's fine motor skills, manipulations, or ability to use her hands in any way. Therefore, the ALJ's failure to consider whether Kroger's arthritis was a severe impairment was not harmless. Remand is necessary for further consideration concerning the severity and any limitations arising from Kroger's arthritis. On remand, the ALJ should examine whether Kroger's arthritis is a severe impairment and, in reviewing the entire record, including Kroger's disability reports, whether Kroger's carpal tunnel syndrome or arthritis or the combination of both is a severe impairment.

27

## II.     Step Three and Listing 12.05C

Kroger argues that the ALJ erred at Step Three in finding that her mental impairment did not meet Listing 12.05C:[16] "The undersigned recognizes the claimant's full-scale intelligence quotient is 70, but Section 12.05C does not apply as the claimant has demonstrated good adaptive functioning levels throughout the years." AR 12. In addition to Listing 12.05C, the ALJ also used the special evaluation technique used for all mental impairments in Listings 12.02 and 12.06. AR 9. The Appeals Council concurred that Kroger did not meet Listing 12.05C and that her mental impairments were not severe. AR. 661. Kroger argues that the ALJ erred in applying Listing 12.05C. The Commissioner responds that the ALJ properly conducted the "special technique" used for mental impairments, i.e. the Psychiatric Review Technique Form (PRTF).

Listing 12.05 differs from the other mental disorders in Listing 12.00 because Listing 12.05 contains an introductory paragraph: If a claimant's "impairment satisfies the diagnostic description in the introductory paragraph

---

[16] Dr. Unruh, the psychologist who completed Kroger's IQ testing, stated that Kroger had borderline intellectual functioning, not mental retardation. AR 367-380. The Eighth Circuit has held that borderline intellectual functioning is an IQ between 71 and 84. *Holz v. Apfel*, 191 F.3d 945, 947 (8th Cir. 1999) (citations omitted). While Kroger's full-scale IQ is 70, which is indicative of mild mental retardation, not borderline intellectual functioning, Kroger only presented medical evidence stating that she has borderline intellectual functioning. Courts routinely employ Listing 12.05C when the claimant has a medical diagnosis of borderline intellectual functioning. *See, e.g., Garcia v. Astrue*, No. C10-0127, 2011 WL 5875160, at *8 (N.D. Iowa Nov. 21, 2011) (utilizing Listing 12.05C for a claimant's diagnosis of borderline intellectual functioning); *Rasmussen v. Shalala*, 16 F.3d 1228, 1994 WL 28405, at *1 (unpublished table decision) (8th Cir. 1994) (same).

28

and any one of the four sets of criteria," then the impairment meets the listing.

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00(A). Listing 12.05(c) and the

introductory paragraph read as follows:

> Mental retardation: Mental retardation refers to significantly
> subaverage general intellectual functioning with deficits in adaptive
> functioning initially manifested during the developmental period; i.e.,
> the evidence demonstrates or supports onset of the impairment
> before age 22.
>
> The required level of severity for this disorder is met when the
> requirements in A, B, C, or D are satisfied.
>
> . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through
> 70 and a physical or other mental impairment imposing an
> additional and significant work-related limitation of function
> . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05.

The Eighth Circuit has summarized Listing 12.05C to require a claimant to

make a four-part showing: (1) a valid verbal, performance, or full scale IQ of 60

through 70; (2) deficits in adaptive functioning; (3) an onset of the impairment

before age 22; and (4) a physical or other mental impairment imposing an

additional and significant work-related limitation of function. *See Maresh*, 438

F.3d at 899 (setting forth elements one, three, and four); *Cheatum v. Astrue*, 388

Fed. App'x 574, 576 (8th Cir. 2010) (per curiam) (setting forth element two and

reasoning that "the requirements in the introductory paragraph are mandatory"

and that "[t]hose requirements clearly include that the claimant suffered deficits

in adaptive functioning[.]" (internal quotations omitted)); *see also Contreras v.*

*Astrue*, No. 08-1196, 2009 WL 5252828, at *6 (D. Minn. Aug. 26, 2009) (utilizing the four-element test).

### A. IQ

The parties do not dispute that Kroger has a full-scale IQ of 70. Thus, element one is met.

### B. Deficits in Adaptive Functioning

Kroger and the Commissioner dispute whether Kroger had "deficits in adaptive functioning," a phrase which the Social Security Administration has not defined. Courts utilize various factors to determine whether a claimant has deficits in adaptive functioning, but generally review whether the claimant has successful social relationships and self-sufficient behavior, the absence or presence of physical problems, and any limitations in the claimant's concentration, persistence, or pace. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *see also Constreras*, 2009 WL 5252828 (adopting an expanded version of this test, as set forth in *Durden v. Astrue*, 586 F. Supp. 2d 828, 832 (S.D. Tex. 2008)).

Other than stating that Kroger has "demonstrated good adaptive functioning through the years," the ALJ provided no further discussion on how Kroger fails to meet Listing 12.05C. "While it is preferable to have an ALJ state explicitly why a claimant failed to meet a listing, the conclusion must be upheld if the record supports it." *Shakespear v. Astrue*, No. 3:10CV00176, 2011 WL 4479252, at *2 (E.D. Ark. Sept. 28, 2011) (citing *Garrett ex rel. Moore v.. Barnhart*, 366 F.3d 643, 649 (8th Cir. 2004) (reasoning that an ALJ's "failure to

30

elaborate is not reversible error so long as substantial evidence in the record supports his conclusion.")); *cf.*, *Cordell v. Astrue*, No. 1:08CV00016, 2009 WL 39973, at *5 (E.D. Ark. Feb. 13, 2009) (reasoning that the Eighth Circuit has rejected a rule employed by other circuits that an ALJ must make specific findings at Step Three).

In his paragraph B analysis, which is used in the PRFT, the ALJ found that Kroger had mild restrictions in her activities in daily living, mild to moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence, or pace, and that Kroger experienced no episodes of decompensation. AR 9. These findings, while not consistent with Listing 12.05C's analysis, support a finding that Listing 12.05C does not apply. While Kroger has never lived alone, sometimes needs to reread directions, needs to write things down if she wants to remember them, and gets nervous and shaky around new people, she is a high school graduate, can read at an 8.8 grade level, spell at a 7.3 grade level, and complete pencil and paper math at a 4.4 grade level. AR 372. Kroger also has a driver's license and, before her back injury, drove to visit friends and her mother, is able to complete word puzzles, and, before her back injury, did her own grocery shopping. In viewing the record, substantial evidence exists to find that Kroger does not meet Listing 12.05C.

Because the ALJ found that Kroger had some restrictions in her activities in daily living, social functioning, and concentration, persistence, or pace, "[i]t necessarily follows that Plaintiff would experience some limitations as a result of these difficulties." *Wakefield v. Astrue*, No. 09-2129, 2010 WL 5186397, at *5

31

(W.D. Ark. Dec. 8, 2010). Even if a claimant's borderline intellectual functioning is not of a listing-level severity, she is still entitled to have the vocational expert consider her mental condition along with her other impairments to determine what impact, if any, her mental impairment has on her RFC. *Id.*; *see also Vincent v. Apfel*, 264 F.3d 767, 770 (8th Cir. 2001) (reasoning that if a claimant suffers from a severe impairment, but not a listed impairment, the "ALJ must use VE testimony or other similar evidence to show jobs exist that [the] claimant can perform" (citing *Wheeler v. Sullivan*, 888 F.2d 1233, 1238 (8th Cir. 1989))).

The ALJ considered Kroger's mental impairments when he analyzed her RFC: "Mentally, the claimant retains the ability to understand, remember and carry out short, simple instructions, interact with co-workers, supervisors, and the public on an occasional basis, respond appropriately to changes in a routine work setting, and make judgments on simple work-related decisions." AR 10. The ALJ included these limitations in the hypothetical given the VE, and, in reviewing the entire record, these limitations are consistent with Kroger's mental ability. Thus, on remand for the other issues, the ALJ should list Kroger's borderline intellectual functioning as a severe impairment at Step Two but otherwise does not need to do any additional analysis with respect to Kroger's alleged mental impairments.

## IV.    Back

Kroger argues that the ALJ erred in determining that her back condition was not a severe limitation and that she was able to work. Kroger first contends that the ALJ erred in failing to fully include all of Kroger's back issues at Step

Two. The ALJ stated that Kroger "has the following severe impairments: degenerative disc disease, lumbar spine, evidenced by multi-level spondylosis at L2-3, L4-5, and L5-S1 and disc bulging at L4-5[.]" AR 8.

Kroger's November 2006 MRI diagnosed her with multiple disc herniations: "Impression: multilevel degenerative disc disease and disc herniations" at L2-3, L4-5, and L5-S1. AR 165. The court need not determine whether the ALJ's error in summarizing the MRI is grounds for reversal because the ALJ's opinions will be reversed on other grounds. On remand, the ALJ should correct this error at Step Two.

Kroger contends that the ALJ disregarded her treatment history for her back pain. AR 11. The ALJ, however, generally discussed Kroger's treatment history and the dates of those treatments, including that she had chiropractic therapy, physical therapy, tried Talwin, a Medro Dosepak, Tramadol, Celebrex, and a TENS unit, and that she had three epidural steroid injections. AR 11. " 'In denying disability [benefits], the ALJ does not have to discuss every piece of evidence presented, but must develop the record fully and fairly.' " *Weber v. Apfel*, 164 F.3d 431, 432 (8th Cir. 199) (alteration in original) (quoting *Miller v. Shalala*, 8 F.3d 611, 613 (8th Cir. 1993) (per curiam)). While the ALJ did not elaborate on every treatment that Kroger tried, he sufficiently and concisely reviewed her attempted treatments and, thus, did not err in setting forth her treatments.

Kroger next alleges that the ALJ improperly concluded that "[p]hysical examinations have, for the most part, been essentially normal. She has usually

33

evidenced no decrease in back range of motion, and a normal gait despite complaints of pain." AR 11. Kroger makes two arguments about why this determination is wrong. First, Kroger alleges that the ALJ improperly discounted Dr. Prasek's September 19, 2009, opinion, and improperly relied on an RFC assessment completed by Dr. Horsley, a non-treating, non-examining consultant for Disability Determination Services dated September 5, 2007. Second, Kroger asserts that the ALJ erred in finding her not credible.

### A.  Dr. Prasek's September 18, 2009, Opinion

If a treating physician's "opinion on the issue(s) of the nature and severity of [the] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence," then the ALJ "will give it controlling weight." 20 C.F.R. § 416.927(d)(2). A treating physician's opinion is generally given controlling weight, but it is not inherently entitled to it, *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006), "particularly if the treating physician evidence is itself inconsistent." *House v. Astrue*, 500 F.3d 741, 744 (8th Cir. 2007) (quotations and citations omitted). If the treating physician's opinion is not given controlling weight under 20 C.F.R. § 416.927(d)(2), the ALJ must weigh it considering the factors set forth in 20 C.F.R. §§ 416.927(d)(2)-(6). 20 C.F.R. § 416.927(d)(2).

The ALJ rejected Dr. Prasek's September 18, 2009, opinion because "if given full credence by the undersigned, would result in a conclusion that the claimant is essentially bedridden or required to lie down for 20 out of every 24 hours during the day. . . . [I]t is not consistent with the claimant's lack of

34

medical treatment, use of even over-the-counter pain medications, or her admitted level of activities of daily living." AR 12.

The ALJ's analysis is not grounded in fact. First, Dr. Prasek never stated that Kroger is essentially bedridden or required to lie down for 20 out of every 24 hours during the day. This appears to be the ALJ's interpretation of Dr. Prasek's September 18, 2009, opinion, but it is an error for an ALJ to substitute his own lay opinions for those of medical experts. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990).

Second, Dr. Prasek's September 18, 2009, opinion is not inconsistent with Kroger's lack of medical treatment. As noted by the ALJ, Kroger attempted multiple forms of treatment, including chiropractic treatments, multiple attempts at physical therapy, prescription and over-the-counter medications, epidural injections, and a TENS unit, and all attempted treatments were ineffective. Substantial evidence supports Dr. Prasek's statement that it is unlikely that Kroger's back condition will improve. Moreover, Kroger's long treatment record with Dr. Prasek, showing diminished reduction in Kroger's flexibility and increased pain over time, supports his conclusions.

Kroger first saw Dr. Prasek on November 30, 2007. AR 362. On March 25, 2009, Dr. Prasek noted that Kroger had diminished Achilles Tendon reflexes and moderately to severely weak flexion of her lower extremities with leg extension. AR 507. A March 26, 2009, MRI showed that Kroger's multilevel degenerative spondylosis had not improved since her November 2006 MRI. AR 486. On April 3, 2009, Dr. Prasek saw Kroger after she experienced a recent fall, which

35

exacerbated her back pain. AR 505. Dr. Prasek noted that Kroger was "not able to do any adequate work at all," she had difficulty bending over, and it hurt to roll from side to side in bed. AR 504. Upon examination, Dr. Prasek found that Kroger's lower extremities exhibited diminished patellar tendon reflexes and diminished strength with flexion and extension of the lower legs. AR 505. Dr. Prasek recommended Kroger try physical therapy again. AR 504-05.

Dr. Prasek next treated Kroger on July 1, 2009. AR 501. He found that the physical therapy had not relieved her symptoms and that "over the last six months if she sits for too long she will develop some mild radiation of pain down the superior buttock region as well." AR 501. Kroger reported that she was "very slow in getting up out of bed in the a.m." due to the pain and that she takes over-the-counter pain medications. AR 501. Dr. Prasek noted that Kroger was "exquisitely tender to palpation to the L4-5, L5-S1 region as well as just above the iliac crest." AR 501. Kroger's "[l]ower extremities exhibit[ed] moderate weakness with hip flexion[.]" AR 501.

Third, the ALJ's statement that Dr. Prasek's opinion is inconsistent with Kroger's use of pain medications is not supported by substantial evidence. Kroger tried the prescription drugs Darvocet-N, a Medro Doespak, Tramadol, Talwin, and Celebrex to alleviate her pain with no avail. While Kroger testified during the hearing that she was not currently taking any over-the-counter medication, she told Dr. Prasek on July 1, 2009, that she took over-the-counter pain medications. AR 501. Furthermore, Kroger is allergic a number of medications, including acetaminophen (Tylenol), Cyclobenzaprine (Flexeril), an

anti-inflammatory, and Nabumetone (Relefen), a non-sterodial anti-inflammatory drug. AR 498, 519.

Fourth, while the Commissioner argues otherwise, Dr. Prasek's opinions are consistent with Kroger's activities of daily living. The Commissioner argues that Dr. Prasek's opinions are inconsistent because, on November 30, 2007, Kroger reported that she was "able to sit okay" and that only sitting for long periods bothered her. AR 362. But the Commissioner does not address Kroger's report in July of 2009 that she had been experiencing pain when sitting for the past six months. The Commissioner, citing Kroger's initial function report (AR 137-43), contends that Kroger consistently told her doctors that she performed significant household duties. But in her function report, Kroger reported that she experiences numerous issues due to her back: she needs help in getting the dishes; only prepares meals two or three times a week; has a limited ability to bend or reach; cannot lift over 10 pounds; cannot kneel or squat; can only stand 30 minutes; can only walk one or two blocks; can only sit 30 minutes; needs a handrail on the stairs; and needs a bath rail if she is going to take a bath without assistance. AR 133-146.

In his September 18, 2009, opinion, Dr. Prasek noted that Kroger's back condition would occasionally interfere with the attention needed to perform even simple work tasks and she could have no physical stress to her back. AR 521. He estimated that Kroger could walk two blocks without rest, sit 10-20 minutes at one time, stand 10-20 minutes at one time, and sit and stand/walk less than 2 hours in an 8-hour workday. AR 521-22. He further found that Kroger would

37

need frequent breaks at work, she may need to lie down during the breaks, and he estimated that she would be absent more than four days a month due to her back condition. AR 524. He believed she could occasionally or frequently lift and carry less than 10 pounds, occasionally lift and carry 10 to 20 pounds, never lift and carry more than 20 pounds, and that she could never twist or stoop and rarely crouch, squat, climb ladders, or climb stairs. AR 522-23. Dr. Prasek's assessment of Kroger's activities of daily living is consistent with the evidence as a whole.

The Commissioner argues that Dr. Prasek's opinions were inconsistent with a November 2007 treatment note from Dr. Pike, where Kroger reported that "she is doing very well." AR 454. Dr. Pike, however, is Kroger's podiatrist who was treating Kroger for pain in her feet. AR 454. The Commissioner also states that Dr. Prasek's opinion was inconsistent with a September 2008 medical record from Dr. McHale, where Kroger stated that she was "doing quite well with no complaints." AR 472. Dr. McHale, however, saw Kroger in November 2008 to follow up on her Hodgkin's disease. AR 472-74. Dr. Prasek's opinions are not inconsistent with Kroger's general statements to Dr. McHale and Dr. Pike that she was doing well, because those doctors did not treat Kroger for her back pain.

The Commissioner contends that the ALJ properly relied on Dr. Horsley's 2007 report in determining Kroger's RFC. While the ALJ may rely on Dr. Horsley's opinions in reviewing the record as whole, "statements of physicians who never personally examined the claimant but only reviewed the reports of examining physicians . . . do not constitute substantial evidence on

the record as a whole." *Brock v. Sec'y of Health & Human Servs.*, 791 F.2d 112, 114 (8th Cir. 1986) (citing *Van Horn v. Heckler*, 717 F.2d 1196, 1198 (8th Cir. 1983)). Moreover, there are several issues with Dr. Horsley's report.

First, Dr. Horsley completed his report on September 5, 2007, two months before Kroger first saw Dr. Prasek. Thus, Dr. Horsley did not review Kroger's medical records from Dr. Prasek, including the records from 2009 after Kroger's fall, which further injured her back.  Second, Dr. Horsley stated that Kroger could occasionally stoop, crouch, and climb ramps, stairs, ladders, ropes, scaffolds, and frequently balance, kneel, and crawl, but left the form blank where it asked for the specific facts upon which his conclusions were based. AR 356. It is unclear from the record on what facts Dr. Horsley relied on in drafting his 2007 opinion.

The Commissioner asserts that after the Appeals Council received evidence that Kroger was diagnosed with lung cancer, it asked Dr. Bell, another state agency physician, to review the evidence to determine whether a change occurred in Kroger's RFC. Dr. Bell concluded that Kroger's lung cancer limited her to sedentary work, but that she was at a light-duty level of activity until September 18, 2009. AR 654. Dr. Bell provided no further analysis about Kroger's other medical impairments and whether they affected her ability to work prior to September 18, 2009. As stated above, a non-treating, non-examining physician's statements do not constitute substantial evidence on the record as a whole.

The ALJ committed a factual error in finding that Dr. Prasek's September 18, 2009, opinion was inconsistent with the medical record and in accepting Dr. Horsley's outdated opinion over that of Kroger's treating physician. On remand, the ALJ should consider all of Kroger's medical records from Kroger's treating physician, Dr. Prasek, incorporate Dr. Prasek's opinions in Kroger's RFC, and, based on this new RFC, present appropriate hypothetical questions to the VE.

**B.  Credibility**

In setting forth Kroger's RFC, the ALJ found that "[t]estimony of the claimant and her boyfriend is accepted as credible only to the extent consistent with the residual functional capacity set forth above." AR 10. Kroger argues that the ALJ erred in finding her testimony not credible.

In weighing a claimant's subjective complaints, the ALJ should analyze the factors set out in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984). Under *Polaski*,

> [t]he adjudicator must give full consideration to all of the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: 1. the claimant's daily activities; 2. the duration, frequency and intensity of the pain; 3. precipitating and aggravating factors; 4. dosage, effectiveness and side effects of medication; 5. functional restrictions.

*Id.*; *see also Choate v. Barnhart*, 457 F.3d 865, 871 (8th Cir. 2006) (applying the same factors). Additional considerations include the claimant's relevant work history and the absence of objective medical evidence to support the severity of claimant's symptoms. *Id.*

40

After considering the *Polaski* factors, the ALJ must make "express credibility determinations[.]" *Masterson v. Barnhart*, 363 F.3d 731, 738 (8th Cir. 2004) (citations omitted). Inconsistencies between the claimant's subjective complaints and the evidence as a whole may warrant an adverse credibility finding. *See Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006). "Although 'an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary.' " *Gonzales v. Barnhart*, 465 F.3d 890, 895 (8th Cir. 2006) (alterations in original) (citing *Ramirez v. Barnhart*, 292 F.3d 576, 581 (8th Cir. 2002)). "In rejecting a claimant's complaints of pain as not credible," an ALJ is expected "to 'detail the reasons for discrediting the testimony and set forth the inconsistencies found.' " *Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)).

"[T]he duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints of pain under the *Polaski* standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible." *Masterson*, 363 F.3d at 738-39. The court "will not disturb the decision of an ALJ who considers, but for good cause discredits, a claimant's complaints of disabling pain." *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005) (internal quotation omitted).

41

Kroger argues that the ALJ failed to follow the *Polaski* framework. The court agrees but finds that an automatic reversal sought by Kroger is unwarranted. While the ALJ neither cited *Polaski* nor explicitly acknowledged the appropriate factors in weighing Kroger's testimony against the record, he did consider some of the factors in his analysis without identifying them as *Polaski* factors. *See Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) (holding that an ALJ need not methodically discuss each *Polaski* factor so long as the factors are acknowledged and examined).

Kroger's work record is sparse because she had not worked for over 21 years at the time of her hearing. As noted by the ALJ, she applied for VR services and was found eligible on January 17, 2008, under "Priority Category II - Significantly Disabled." AR 197. The ALJ found that Kroger's VR file was closed due to an issue with her feet and that Kroger did not contact VR services after that condition was resolved. AR 10. The ALJ's assessment of Kroger's interactions with VR services is not entirely supported by the record.

During a February 25, 2008, meeting with Nelson, Kroger stated that her back had been much worse the past several months, it burned so badly that she could hardly stand it, and she had to do chores in small increments with periods of rest in between work. AR 187. Kroger felt that she could not complete any of the offered programs because of her pain. AR 187. Kroger then had surgery on her big toe and was unable to participate in the program. AR 183, 184, 196. Nelson closed Kroger's VA file due to her "medical issues," AR 180, not just issues with her feet.

The ALJ found that Kroger's medical records did not support her subjective complaints of pain because her physical examinations have been essentially normal, and she has had no decrease in range of motion of her back or change in gait. As stated above, the ALJ erred in this determination because Kroger's medical examinations were not normal; instead, they showed that she had a decrease in range of motion and that her back issues increased over time. Specifically, Dr. Stone noted on April 23, 2007, that Kroger had moderate to severe limitations in her lumbar range of motion, and extensions and rotations increased her pain. AR 279

The ALJ also found that Kroger's activities of daily living have been "fairly normal," but he did not expressly weigh Kroger's activities of daily living against her testimony. Instead, he compared Kroger's activities of daily living with Goetz's testimony in determining that Goetz was not credible. As stated above, however, Kroger has experienced a marked decrease in her ability to perform her activities of daily living since her back injury and carpal tunnel syndrome/ osteoarthritis. She struggles to complete chores without needing a break, does not cook as often, is unable to do the laundry, cannot vacuum more than one room at time, sometimes can do buttons and zippers and sometimes cannot, needs help hooking her bra; cannot make the bed, cannot do all of the dishes at one time, cannot go grocery shopping alone, cannot carry a basket of clothes downstairs to do the laundry, typically does not drive, cannot ride in a car more than 30 minutes without needing to lie down in the backseat, and needs to sit in chairs with arms or needs other help to stand up from the chair. AR 38-51. The

record as a whole does not support the ALJ's conclusion that Kroger can complete "fairly normal" activities of daily living.

Kroger argues that the other *Polaski* factors, the "duration, frequency and intensity of the pain," and "precipitating and aggravating factors," as discussed in Dr. Prasek's September 18, 2009, source statement support a finding that Kroger is credible. The Commissioner did not discuss these factors. Kroger's back issues began in 2006, and, thus, existed for three years at the time of the ALJ hearing. Kroger experiences a base pain level of five on a scale of zero to ten, but the pain can flare up to a six or a seven if she does certain activities. The pain is aggravated by numerous activities such as sitting or standing without a break for a long period of time. These factors weigh in favor of finding Kroger credible, but were not discussed by the ALJ.

If the ALJ would have credited Kroger's testimony about the pain she experiences and her ability to perform activities of daily living, then the hypothetical questions to the VE would have to be altered. Thus, on remand, the ALJ should, consistent with this opinion, revise Kroger's RFC and propose appropriate hypothetical questions to the VE.

## V.    Ability to Work

Kroger argues that substantial evidence does not support the hypothetical questions posed to the VE. Because the court has remanded this case to the ALJ for other reasons for reconsideration of Kroger's RFC, on remand the ALJ should also reconsider the hypothetical questions posed to the VE.

44

**CONCLUSION**

Because the court finds that the ALJ erred in determining that Kroger's carpal tunnel syndrome/arthritis was not a severe impairment and discounting both Dr. Prasek's opinion and Kroger's testimony about her subjective complaints of pain, the court remands to the ALJ for further proceedings. Accordingly, it is

ORDERED that the Commissioner of Social Security's decision denying Dianne M. Kroger's claim for SSI under Title XVI of the Social Security Act is reversed and this matter is remanded to the Commissioner for further proceedings consistent with this opinion.

Dated February 13, 2012.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE